Citation Nr: 1434255 
Decision Date: 07/31/14 Archive Date: 08/04/14

DOCKET NO. 04-37 093 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida



THE ISSUE

Entitlement to service connection for a left knee disorder.



REPRESENTATION

Appellant represented by: James G. Fausone, Attorney



ATTORNEY FOR THE BOARD

A.M. Ivory, Counsel




INTRODUCTION

The Veteran served on active duty from March 1967 to March 1971.

This appeal comes before the Board of Veterans' Appeals (Board) from a September 2003 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida, which denied the Veteran's claim for service connection for a left knee disorder.

In October 2007, the Board issued a decision denying the claim. The Veteran appealed that decision to the United States Court of Appeals for Veterans Claims (Court or CAVC); in a September 2009 Memorandum Decision, the Court vacated the October 2007 Board decision and remanded the case to the Board for further readjudication.

In August 2010 and February 2012, the Board remanded the issue on appeal for further development. 

This appeal was processed using the Veterans Benefit Management System (VBMS) paperless, electronic claims processing system. In addition to the VBMS file, there is also an electronic (Virtual VA) paperless claims file. The documents contained therein are duplicative of the evidence in the VBMS file or are irrelevant to the issue on appeal therefore, the Board can proceed without prejudice to the Veteran.


FINDING OF FACT

The Veteran does not manifest any residuals related to his February 1968 left knee injury; his current left knee disabilities of degenerative joint disease, medial meniscus tear and patellofemoral syndrome/chondromalacia patella first manifested many years after service and are not causally related to an event in service.


CONCLUSION OF LAW

The Veteran does not have a left knee condition that is due to disease or injury that was incurred in or aggravated by active service. 38 U.S.C.A. §§ 1101, 1110, 1112, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309 (2013). 


REASONS AND BASES FOR FINDING AND CONCLUSION

I. Duty to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107 (West 2002); 38 C.F.R §§ 3.102, 3.156(a), 3.159, 3.326(a) (2013). Proper VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1). 

In Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006), the Court held that the VCAA notice requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service connection claim. Those five elements include: 1) Veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability.

In Pelegrini v. Principi, 18 Vet. App. 112 (2004), the Court held that a VCAA notice, as required by 38 U.S.C.A. § 5103(a), must be provided to a claimant before the initial unfavorable Agency of Original Jurisdiction (AOJ) decision on the claim for VA benefits. 

Pertinent to the claims on appeal, the Board finds that VA has satisfied its duty to notify under the VCAA. Specifically, a January 2005 letter advised the Veteran of the evidence and information necessary to substantiate his service connection claim, as well as his and VA's respective responsibilities in obtaining such evidence and information. A January 2010 letter informed the Veteran of the evidence and information necessary to establish a disability rating and an effective date in accordance with Dingess/Hartman, supra. The claim was subsequently readjudicated in a December 2011 supplemental statement of the case (SSOC) which has cured the timing deficiency. See Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Prickett v. Nicholson, 20 Vet. App. 370, 376 (2006).

Relevant to the duty to assist, the Veteran's service treatment and personnel records as well as post-service private and VA treatment records have been obtained and considered. Significantly, neither the Veteran nor his representative has identified, and the record does not otherwise indicate, any additional outstanding evidence that is necessary for a fair adjudication of the claim that has not been obtained. 

The Veteran was afforded VA examinations in September 2003, November 2004, and November 2010 and a VA addendum opinion was rendered in November 2011. The Board finds that the November 2010 VA examination with addendum opinion in November 2011 VA is adequate since it involves a thorough and contemporaneous examination of the Veteran that took into account his report of left knee injury and symptoms in light of records of service treatment records and records of post-service examination and treatment. 

The Veteran's claims were remanded by the Board in August 2010 and February 2012. In August 2010, the Board remanded in order to obtain the Veteran's VA treatment records, to contact the Veteran to obtain information about his post-service 1973 accident, to afford the Veteran a VA examination, and to readjudicate in an SSOC. As noted in the December 2011 SSOC, the Veteran's VA treatment records were obtained, the Veteran submitted a detailed statement about his post-service 1973 accident in October 2010 and submitted medical evidence related to his 1973 accident. As noted above, the Veteran was afforded a VA examination in November 2010 and a VA addendum opinion was rendered in November 2011. The Veteran's claim was readjudicated in the December 2011 SSOC. 

In February 2012, the Board remanded the Veteran's claim to obtain records from the Social Security Administration (SSA). In June 2012, SSA informed the RO that all records were destroyed which was recorded in a September 2012 VA memorandum. In September 2012, the RO informed the Veteran that they could not obtain any SSA records and requested the Veteran to send any additional information; in October 2012, the Veteran's representative stated that the Veteran had no SSA records in his possession. In response, the Veteran authorized the RO to obtain records from the Florida Department of Health. 

In January 2013, the RO sent a letter to the Florida Department of Health to obtain the Veteran's records. However, later that month, the Florida Department of Health directed the RO to obtain records from SSA Field Office in Pensacola, Florida. The RO then contacted the SSA Field Office in Pensacola, Florida by correspondences in February 2013, April 2013, June 2013, and August 2013 but there was no response. 

In February 2014, the RO informed the Veteran of all steps taken to obtain any outstanding records; however, the Veteran has not responded with any additional documents. In this situation, the Board determines that SSA records have been destroyed and that any further attempts to obtain records would be futile. In this respect, the main SSA office has informed VA that SSA records have been destroyed, and the SSA Field Office in Pensacola, Florida has failed to respond to VA's repeated requests for any potential records in their possession.

Therefore, the Board finds that the requested development directed by the August 2010 and February 2012 Board remands has been completed, no further action to ensure compliance with the remand directive is required. See Stegall v. West, 11 Vet. App. 268 (1998); Dyment v. West, 13 Vet. App. 141, 146-47 (1999). 

Thus, the Board finds that VA has fully satisfied the duty to assist. In the circumstances of this case, additional efforts to assist or notify the Veteran in accordance with the VCAA would serve no useful purpose. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991) (strict adherence to requirements of the law does not dictate an unquestioning, blind adherence in the face of overwhelming evidence in support of the result in a particular case; such adherence would result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (remands which would only result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant are to be avoided). VA has satisfied its duty to inform and assist the Veteran at every stage in this case, at least insofar as any errors committed were not harmful to the essential fairness of the proceeding. Therefore, he will not be prejudiced as a result of the Board proceeding to the merits of his claim on appeal.

II. Analysis

Service connection may be granted for disability resulting from disease or injury incurred or aggravated during a veteran's active service. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303. Service connection may be granted for any disease diagnosed after discharge from service when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). 

In order to establish entitlement to service connection for any disability on a direct basis, the record must contain competent evidence of (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). 

Alternatively, service connection may be established under 38 C.F.R. § 3.303(b) by (a) evidence of (i) the existence of a chronic disease in service or during an applicable presumption period under 38 C.F.R. § 3.307 and (ii) present manifestations of the same chronic disease, or (b) when a chronic disease is not present during service, evidence of continuity of symptomatology. For the showing of chronic disease in service, there are required a combination of manifestations sufficient to identify a disease entity, and sufficient observation to establish chronicity at the time, as distinguished from merely isolated findings or a diagnosis including the word chronic. 38 C.F.R. § 3.303(b). Continuity of symptomatology is required only where the condition noted during service is not, in fact, shown to be chronic or when the diagnosis of chronicity may be legitimately questioned. Id. When the fact of chronicity in service is not adequately supported, then a showing of continuity after discharge is required to support the claim. Id. 

However, the continuity and chronicity provisions of 38 C.F.R. § 3.303(b) only apply to the chronic diseases enumerated in 38 C.F.R. § 3.309(a). Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013), overruling Savage v. Gober, 10 Vet. App. 488, 495-96 (1997) (applying 38 C.F.R. § 3.303(b) to a chronic disease not listed in 38 C.F.R. § 3.309(a) as "a substitute way of showing in-service incurrence and medical nexus.") Arthritis it listed as a chronic disease under 38 C.F.R. § 3.309(a).

The claimant bears the burden of presenting and supporting his/her claim for benefits. 38 U.S.C.A. § 5107(a). See Fagan v. Shinseki, 573 F.3d 1282 (Fed. Cir. 2009). In its evaluation, the Board shall consider all information and lay and medical evidence of record. 38 U.S.C.A. § 5107(b). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Board shall give the benefit of the doubt to the claimant. Id. Another way stated, VA has an equipoise standard akin to the rule in baseball that "the tie goes to the runner." Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990). The-benefit-of-the-doubt doctrine is not applicable based on pure speculation or remote possibility. See 38 C.F.R. § 3.102.

The Veteran asserts that his current left knee condition is due to his military service. The Board notes that the Veteran's current diagnosed left knee condition, as demonstrated by VA medical records and a November 2004 VA examination, is a left medial meniscal tear, patellofemoral syndrome/chondromalacia patella and degenerative arthritis. 

The Veteran's service treatment records show that, in February 1968, he slipped on ice, fell, and hurt his knee. A February 13, 1968 noted that the Veteran's knee was painful and he was unable to bear weight. An x-ray examination was interpreted as showing no fracture or dislocation. He was given an impression of partial tear of the medial collateral ligament (MCL), and the left knee was immobilized in a cast with a 15 degree flexion. A February 21, 1968 treatment record, however, prepared by the February 13, 1968 examiner noted that the Veteran had been treated for the last 12 days for an MCL strain. On March 13, 1968, this same examiner noted that the Veteran had been casted for 4 weeks due to a left knee strain with no complaints or tenderness. The examiner prescribed cast removal.

Thereafter, for the remaining 3 years of active service, the Veteran's service treatment records do not reflect any lay or medical evidence of left knee disability. On his January 1971 Report of Medical History for Separation, the Veteran specifically denied symptoms such as arthritis, rheumatism, trick or locked knee. At this time, his lower extremities were found to be clinically normal. 

In October 1973, the Veteran was in a post-service motor vehicle accident (MVA). The medical records from his hospital stay indicate that the Veteran was diagnosed with multiple facial fractures and a fractured pelvis. There was no mention of the Veteran's left knee within the hospitalization record or the subsequent treatment records extending to 1977. By April 1975, the Veteran described being 80 to 90 percent back to normal and engaging in activities such as bowling, playing golf and working full-time.

In pertinent part, a November 29, 2002 VA treatment note by Dr. G. recorded the Veteran's history of town ligaments of the leg in 1968 as well as general aches and pains in his knees and pelvic area from degenerative arthritis that developed over the years as a result of an auto accident that he suffered many years ago and the type of heavy work that he was doing. Following examination, Dr. G. offered an impression of slight weakness of the lower extremity.

In a statement dated July 2003, the Veteran reported having been diagnosed with torn ligaments as a result of his 1968 slip and fall injury. He described having intense knee pain which required treatment in a full leg cast for six weeks. 

The Veteran was afforded a VA examination in September 2003. He reported his in-service injury and stated that, after his military service, he returned to his pre-service job of a cabinet making. A magnetic resonance imaging (MRI) scan was interpreted as showing a tear of the posterior horn of the medial meniscal cartilage extending to the inferior articular surface and a slight degree of increased signal in the medial patellar cartilage facet which may indicate an element of chondromalacia patella. The VA examiner diagnosed the Veteran with a history of old left knee MCL injury. 

A November 2003 VA clinic record noted the Veteran's history of torn left knee ligament since 1968. An x-ray was interpreted as suggesting calcification to the medial condyle of the left femur which could indicate an old ligament injury. There were no arthritic changes. He was given an impression of torn medial meniscus of the left knee. In December 2003, the Veteran provided a history of MVA with multiple facial fractures and a fractured pelvis.

In a statement received in September 2004, the Veteran described chronic left knee symptoms since service which he self-treated with over-the-counter medication ointments and wraps.

At a November 2004 VA examination, the Veteran was diagnosed with left knee patellofemoral syndrome. The VA examiner stated that the Veteran was initially diagnosed with a ligament strain and no further treatments were noted. In addition, a 2003 MRI scan showed a meniscus tear; thus, there were 35 years between his initial injury and the 2003 MRI. Also, the only injury noted is the ligament strain from 1967. The VA examiner opined that the Veteran's current left knee disability would not be related back to his initial ligament strain that occurred in 1967. 

In a statement dated November 2004, the Veteran reported having no knowledge that his left knee injury in service was diagnosed as a ligament strain as the military physician had provided a diagnosis of a torn ligament. He also denied any history of left knee injury after service.

A witness statement received in May 2005 reported actual knowledge of the Veteran's left knee injury in service which required casting.

The Veteran was afforded a VA examination in November 2010. Additional findings included x-ray evidence of mild degenerative joint disease of the knee with the articular surfaces appearing to be adequate and smooth. Following interview and examination of the Veteran as well as review of the claims folder, the VA examiner provided the following diagnosis and opinion:

1. Left knee medial collateral ligament sprain in service. Resolved. No residuals.
2. Left knee medial meniscus tear, chondromalacia patella and mild DJD. Mild functional limitation. It is not related to or caused by #1.

Discussion. The veteran's currently diagnosed left knee disorder is not caused by or related to his injury during service. The veteran's in service 1968 injury was noted to be a ligament sprain. The x-rays were negative and there was no MRI or CT scanning of the knee to prove the ligament was torn. The November 2004 VA examiner's opinion is correct regarding the current left knee disorder not being causally related to his active service. The claim was being made 35 years after the incident and the ligament involved in the service injury is not the same as the current left knee condition. I have no way of knowing what effect the 1973 accident had on the left knee or whether it was an inter current injury there was no documentation to support a left knee injury in the records in regards to that accident.

In an addendum dated November 2011, the VA examiner offered the following discussion of the November 2002 VA clinician impression:

Opinion. In the exam dated 11/29/2002, Dr Gharakhanian notes the veteran's subjective responses including complaints of aches and pains in his knees and pelvic area from DJD that he developed over the years as a result of auto accident that he suffered many years ago and type of heavy work that he has been doing. His exam notes adequate range of motion of the lower extremities and a slow small step type walk secondary to pain in his knees and pelvic area. His diagnostic impression is slight weakness of lower extremity. This note suggests the veteran was doing heavy work which could have contributed to the veteran's current knee condition. 

This does not change my prior opinion from the 11/3/2010 C&P exam.

Following review of the lay and medical evidence in this case, the Board finds that the Veteran does not manifest any residuals related to his February 1968 left knee injury, and that his current left knee disabilities of degenerative joint disease, medial meniscus tear and patellofemoral syndrome/chondromalacia patella first manifested many years after service and are not causally related to an event in service.

The most probative evidence in this case consists of the November 2010 VA examiner opinion with addendum which opined that the Veteran incurred a left knee medial collateral ligament sprain in service which resolved without residuals, and that his current diagnoses of left knee medial meniscus tear, chondromalacia patella, and mild DJD are not related to the February 1968 injury. In this respect, the Board finds that this opinion is most consistent with the credible lay and medical evidence in this case.

First, the Board observes that there is no dispute of fact that the Veteran incurred a left knee injury in February 1968. There is some controversy, however, as to the actual diagnosis. On February 13, 1968, the Veteran's treating military physician offered a diagnosis of a torn MCL requiring immobilization. However, on two subsequent occasions on February 21, 1968 and March 13, 1968, this same physician specifically referred to the Veteran as having incurred a strain. Thus, the November 2010 VA examiner's opinion that the Veteran incurred a left MCL strain and not a torn MCL is entirely consistent with the subsequent change of diagnostic impression by the military examiner from a torn MCL to strain after a period of additional examination and observation.

The November 2010 VA examiner's opinion is also consistent with the immediate post-injury history wherein, after the cast was removed on March 13, 1968, the Veteran was not given any duty limitations or that, in the following three years, the Veteran did not seek treatment for left knee symptoms. Notably, the Veteran has not report the need for further military treatment after the initial injury and treatment. 

The November 2010 VA examiner's opinion is also consistent with the statements by the Veteran at the time of his discharge from service in January 1971, wherein the Veteran specifically denied symptoms of arthritis, rheumatism, trick or locked knee with normal physical findings at that time.

The November 2010 VA examiner's opinion is also consistent with the available postservice medical records from 1973 to 1977 which do not reflect lay or medical evidence of left knee disability. Rather, there is at least a showing in April 1975 wherein the Veteran reported engaging in activities such as bowling, playing golf and working full-time without any specific left knee complaints, and that the current left knee abnormalities were first treated more than 3 decades after service.

The November 2010 VA examiner's opinion also rationalizes that the current left knee disorders, involving degenerative joint disease, meniscal tear and patellofemoral syndrome/chondromalacia, are different medical disorders than the left MCL involved in service. In this respect, the record does not reflect any current diagnoses involving the left MCL.

On the other hand, the Board finds no direct medical opinion supporting the Veteran's claim. As indicated above, the Veteran was initially diagnosed with a torn MCL on February 13, 1968 but, on two occasions after this initial diagnosis, the same treating military physician offered a diagnosis of MCL strain rather than tear. Thus, on this basis alone, the final diagnosis offered by the military physician would tend to offer greater probative value as it was based on a subsequent history of physical examination and observation. To the extent the initial evaluation has probative value, it is greatly outweighed by the November 2010 VA examiner's interpretation of diagnoses in service which is based upon review of the Veteran's entire treatment history since service.

In a prior Memorandum Decision, the Court interpreted a November 29, 2002 VA clinic record (referred to as a VA examination at one point) for supporting an assertion that Dr. G. stated that the Veteran tore a ligament in service. A careful review of that treatment record reflects that this statement occurred in a recording of past medical history, and appeared to be a transcription of what the Veteran was reporting. With respect to any probative value as to diagnosis, etiology and nexus, the Board places significantly greater probative weight to the November 2010 VA examiner conclusion as the opinion was based upon review of the entire claims folder, including the service treatment records which are not shown to have been available to Dr. G. in November 2002.

In a prior Memorandum Decision, the Court also interpreted a September 2003 VA examiner as concluding that the Veteran fell and tore his ligament in service. In a medical history section, the VA examiner stated as follows:

MEDICAL HISTORY: While on active duty in 1968 veteran slipped on ice and tore the medial collateral ligament in his left knee. He was placed in cast for six weeks and remained on duty with no loss of time from work.

In the Board's opinion, the September 2003 VA examination report is ambiguous as to whether the VA examiner was actually making a factual finding of a torn MCL or merely recording the Veteran's history. For example, the Veteran was actually in a cast for 4 weeks and not 6 weeks, and the history of Veteran not losing time from work is not directly recorded in the service treatment records and came directly from the Veteran's examination interview. To the extent the VA examiner actually concluded that the Veteran tore his left MCL in service, the Board places greater probative weight to the finding of the November 2010 VA examiner's conclusion which is based upon specific review of the changed diagnosis from an MCL tear to strain in service, and the post service treatment records which include an addition of private treatment records from 1973 to 1977 which were not available to the September 2003 VA examiner.

The only other evidence tending to support a finding of chronic left knee disability since service includes the Veteran's own opinions and beliefs. The Veteran asserts that he was told by a military physician that he incurred a torn MCL in service. This statement holds probative value as the Veteran is clearly competent to report what diagnosis a physician offered. In fact, this recollection is accurate as, on February 13, 1968, the Veteran's treating physician did offer a diagnosis of a torn left MCL. However, as discussed above, this physician later offered diagnoses of a left MCL strain on February 21, 1968 and March 13, 1968. Overall, the Veteran's recollection of diagnosis is credible and accurate, but significantly outweighed by the subsequent change of diagnosis by his treating physician and, ultimately, the opinion of the November 2010 VA examiner who has greater training and expertise than the Veteran to provide a medical diagnosis based upon review of the military treating physician's notes, subsequent treatment records and current medical findings. 

The Veteran has also offered a history of chronic left knee symptomatology since service which he self-treated for many years which, if credible, could support a finding of service connection for arthritis under 38 C.F.R. § 3.303(b). Notably, however, his report of continuity of symptomatology alone could not support a service connection claim for the patellofemoral syndrome/chondromalacia and meniscal injury diagnoses per the holding in Walker.

While the Veteran is clearly competent to report left knee symptoms he experienced, his functional limitations and types of self-treatment, the Board finds that the most credible evidence is against a finding of chronic left knee symptoms since service. Following the cast removal in March 1968, the Veteran had just under three years of additional active service absent any lay or medical evidence of left knee symptomatology. Importantly, at his separation, the Veteran specifically denied symptoms of arthritis, rheumatism, trick or locked knee which directly contradicts his current recollections. 

The Board places significant probative weight on the Veteran's denial of left knee symptoms on his January 1971 separation examination, as this statement was made contemporaneous in time to service discharge and bears the indicia of reliability as it was made in the context of seeking appropriate medical diagnosis at service separation. See Lilly's An Introduction to the Law of Evidence, 2nd Ed. (1987), pp. 245- 46 (many state jurisdictions, including the federal judiciary and Federal Rule 803(4), expand the hearsay exception for physical conditions to include statements of past physical condition on the rational that statements made to physicians for purposes of diagnosis and treatment are exceptionally trustworthy since the declarant has a strong motive to tell the truth in order to receive proper care). 

On the other hand, the Veteran's current recollections - which are made more than 3 decades following the events in question - contradict his statement upon separation and are not consistent with the normal physical findings on separation. Additionally, the Veteran first sought formal treatment for his current left knee symptoms over thirty years after his service discharge which, combined with his denial of symptoms and normal clinic findings at service separation, tends to weigh against a finding of chronic disability since service. See Maxson v. West, 12 Vet. App. 453 (1999), aff'd, 230 F.3d 1330 (Fed. Cir. 2000). 

The Board also observes that the Veteran has submitted a witness statement to his left knee injury and service which credibly describes the in service injury and treatment in 1968. However, the probative value of this statement as it pertains to the correct in service diagnosis and any nexus to the current left knee disabilities is greatly outweighed by the November 2010 VA examiner's opinion. 

Based upon the above, the Board finds that service connection for a left knee disability is not warranted. In reaching this decision, the Board has considered the applicability of the benefit of the doubt doctrine. However, the preponderance of the evidence is against the Veteran's claim of entitlement to service connection for left knee disability. As such, that doctrine is not applicable in the instant appeal, and his claim must be denied. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert, supra.


ORDER

Service connection for a left knee condition is denied. 



____________________________________________
T. MAINELLI
Acting Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs